## Case No. 13,664.

### The SWALLOW.

[Olc. 4.] [1]

District Court, S. D. New York. Sept., 1843.

SEAMEN — WAGES — DESERTION — TESTIMONY OF JOINT LIBELLANTS—TACKING CLAIMS—COSTS.

1. By the well-settled principles of maritime law, where seamen employed for a voyage, or by the month, voluntarily leave the vessel before the termination of the voyage, or the expiration of the time for which they hired, without good cause, or the consent of the master, they will thereby forfeit the wages previously earned.

[Cited in The John Martin, Case No. 7,357.]

2. A party will not be allowed, by tacking a small undisputed claim, upon which he has never made a demand, to a contested claim for wages denied him, to recover costs on the demand denied him.

[Distinguished in Walsh v. The Louisiana, 4 Fed. 752.]

3. The principles touching the duties of seamen under a contract of hiring on a sea voyage are binding upon those engaged in the navigation of inland tide waters. A suit for wages cannot be maintained until the contract of service is performed or released.

[1] [Reported by Richard Olcott, Esq.]

4. The testimony of a ship's crew, being joint libellants, each swearing for the other, will be received with great caution. The court will be more inclined to credit the master of the vessel, when the evidence between them is contradictory and he has no interest in the action.

5. Full costs will be decreed the claimant, although the demand of the libellants is less than $50 to each.

In admiralty.

Mr. Benedict, for libellants.
Mr. Hoffman, for claimant.

BETTS, District Judge. The crew of the steamboat Swallow arrested the ship upon a joint libel for wages for half a month's service on board her upon the North river. She is a large passenger vessel, making daily trips between New York and Albany. The action is defended, upon the ground that the libellants deserted the vessel, and thereby forfeited their right to wages. The libellants were employed by the month as deck hands on the boat, and the answer charges, that without the consent of the master, or any officer of the boat, they left the ship before the termination of the time for which they had engaged to serve, and as the boat was about leaving this port on her daily trip to Albany. It is admitted that a claim of Dates, one of the libellants, for $15, for taking charge of the boat during the winter months, is just, and ought to be paid.

By the well-settled principles of maritime law, where seamen, employed for a voyage or by the month, voluntarily leave the vessel before the termination of the voyage or the expiration of the time agreed upon, without justifiable cause or the consent of the master, they thereby forfeit all wages previously earned. The libellants, as witnesses each for the other, give evidence tending to show that they were discharged from the boat by the master. The testimony is met by express denial on the part of the master. His testimony, if believed, is conclusive that the men left the boat in his absence and without his consent. The law admits a crew to testify on a question for wages for each other, but does not disregard the bias which will naturally influence them to give the case a coloring most favorable to their feelings and interests; and it is to be furthermore noticed, that they are all implicated in the charge of disorderly and mutinous conduct on board, and that their joint testimony is intended to establish for them a justification of their conduct. Their evidence, under such circumstances, must be received with great caution. The boat arrived here from Albany the morning of the day the libellants left her. The day previous, about breakfast time, a fight had occurred in the kitchen and on the deck between the cooks and some of the crew, one Rhind being the ringleader. The other libellants joined Rhind in the affray. The master joined the boat at Red Hook, on her passage down from Albany, and next morning,

on learning the disturbance, he discharged the two cooks and Rhind in New York. Their wages were paid to the time of their discharge.

The libellants, to justify leaving the vessel, and to establish their right to wages, attempt, by their own testimony, to prove they were discharged by the master. Dates says: "That he, in presence of three or four others, asked the master what was to be done; whether they or the black men (cooks) were to go ashore? The master replied, they might every d—d one go ashore, and go to the office for their money." Deyo says: "He went to the master with Dates and asked what was to be done? The master said he would look into the matter, and those who were in fault might go ashore, and those who were not might stay." Fuller replied: "I am one of them." Dates said, he, also, had been engaged in the disturbance. The master said, "he had more trouble than a little with him, and told Knight to pay them all off and let them go," and then the master went away. The witness turned to his work. Crum testified, that Dates asked the master "what he intended to do with the black men?" The master replied, "he had discharged them, and would discharge all who were concerned with them." Fuller said, "he was one," and the master ordered Knight to pay him off. Dates said, "he might as well go, too," and the master said, "Let every d—d one of them go." Sellick gives this account of the occurrence: "Dates asked the master what was to be done about the disturbance?" He answered, "he had discharged the two negroes and Rhind, and meant to discharge as fast as he found others interested." Fuller said he was interested, and the master said: "Go to the office and get your money, and every d—d one of you." A number of the crew, he thinks a majority, were there sitting on chairs and boxes near by. The master testifies, that he ordered the cooks and Rhind to be discharged in the morning —at about 11 a. m.—the work on the boat having been done up. The men were sitting about on boxes. At this time Fuller asked what was to be done. He replied, that if any one had any thing to do with the disturbance he would discharge him. Fuller said he was one. Witness ordered him ashore, and to go and get his money. The remainder of the crew were dispersed about the boat. Dates said he had struck the negroes, and the witness answered he had done right, and then all the men went to work. At about 3 p. m. he first heard the men had left the boat; he directed the pilot to supply their places, but not to take either of those who had left. The pilot wished to take one or two of them. No one of these men offered to return to duty. The pilot testified that he tried to dissuade the men from leaving the boat, but they said the master told them they might go ashore.

This rehearsal of the testimony as to the disturbance on the boat and the declarations of the master show that there was no direct discharge of any of the libellants, or any consent on his part to their leaving the ship. It will be seen that Dates gives a different version of his language from the other witnesses, and confirms the statement made by the master. The libellants asked him what was to be done in regard to the occurrence of the previous morning, and he replied, "that he would look into the matter, and those who were in fault might go ashore." No other complaint was made against the hands than the particular act of misconduct and disorder at Albany, and the direction, or rather permission, to go ashore and be paid off, was a correction for the fault they had committed. They elected to accept that punishment, and tendered no apology or atonement for their conduct, nor did any one offer to remain with the vessel and perform his duty. The burden of proof is upon the libellants. They broke their contract, and they must show that they have a clear excuse in law for so doing. If they were discharged without just cause, they would be entitled to recover the full amount of the wages for the month; so, also, if they leave before the time of service for which they engaged has expired, without a legal excuse, they forfeit all wages earned.

In comparing the statements of the libellants themselves with those of the master and pilot, I am satisfied his order or direction to go ashore applied to the men alone who had engaged in the affray on board, and not to all the libellants. The reciprocal testimony of the libellants, each endeavoring to prove a discharge for his fellows, should be received and acted upon with great caution, especially when it stands contradicted by the evidence of the master, and the strong probabilities of the case. It would be a dangerous confidence in evidence, derived from witnesses so circumstanced, to hold that it authorized all these men to abandon the ship, and maintain an action for full wages for the term of their contract, and of mischievous influence to countenance in a crew conduct so disorderly as that pursued by these libellants. For a crew to leave abruptly a large passenger steamer, on the point of sailing, might cause the trip to be lost to the owners, and the traveling community to be greatly inconvenienced, or perhaps the more serious hazard of putting the vessel in the charge of those unskilled and incompetent to her safe management. This freak on board the boat, in which so much hasty temper was displayed, afforded no excuse to the men for breaking their contract and resorting to an action for future or past wages.

When the parties had come to a cooler consideration, the whole matter might probably have been compromised between them; the owners, upon a suitable acknowledgment due on the part of the men, should have overlooked the irregularity and breach of duty

which had occurred, and continued them on board with pay for their past services. The libellants have not chosen to adopt this course; and instead of resorting to a trial by jury before a local court, where the equities on both sides might have been considered with liberal allowances to both parties, they have chosen to arrest the ship in a court of admiralty, and submit their rights to be decided on the principles of the maritime law, and the owners insist their claim shall be judged by the strict rules of that law. By the maritime law, an authorized and deliberate departure by seamen from a ship in the course of a voyage, without intending to return to her, is cause for the forfeiture of antecedent wages earned by them. Cloutman v. Tunison [Case No. 2,907]; 3 Kent, Comm. 198. But the court might exercise a discretion in such case, and even if the men were guilty of a willful desertion, might reduce an absolute forfeiture of wages to a fine or mulct proportionate to the offence. The Union [Id. 14,347]; The Lady Campbell, 2 Hagg. Adm. 5; The Malta, Id. 168. These principles embrace maritime services and obligations of seamen employed in coasting, or tide water navigation on rivers, equally as at sea. Under the facts in proof, the libellants had no right to abandon the ship of their own accord, and they fail to show that kind of discharge by the master which would sustain the obligation of the ship to them for their wages. He was justifiable in punishing them for misconduct on board by putting them ashore at their home port; and his direction to them to go to the clerk of the boat and receive pay for half a month's wages was no recognition of the legal obligation of the ship to them for wages.

So, also, it is to be observed that their hiring was by the month, and both by the admiralty and the common law, if they leave the service during the month, without justifiable cause, the obligation to pay for past services is destroyed. Dates is entitled to recover the $15, antecedently due him; but as no proof is given that he ever demanded that money, he will not be allowed now, by tacking it to his other claim, to carry costs. If there be an equity in his behalf to costs on this demand, the owner would have an equal equity to costs against him on the other, which was the only subject of contestation, and, as far as appears upon the proofs, the only one made known to the owner or master. The case as to costs will prove a hard one on the libellants, but it was their folly or misfortune to bring an action where they had not sufficient proof to support it.

On the evidence as it stands, I am of opinion that there must be a decree for full costs against all the libellants, except Dates, although the respective demands are below $50; and that a decree be entered in favor of Dates for the sum of fifteen dollars, without costs.